## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NA KEISHA LAVONNE HARRIS | : | |
|     Plaintiff, | : | |
| | : | No. 3:18-CV-2064 (VLB) |
|     v. | : | |
| | : | |
| ANDREW SAUL, *ACTING* | : | March 30, 2020 |
| *COMMISSIONER OF SOCIAL* | : | |
| *SECURITY*, | : | |
|     Defendant. | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION ON
## MOTION TO REVERSE [DKT. 13] AND MOTION TO AFFIRM [DKT. 14]

### Introduction

Na Keisha Lavonne Harris ("Ms. Harris") challenges the Commissioner of Security, now Andrew Saul's[1], final decision to discontinue Ms. Harris's Supplemental Security Income ("SSI") under 42 U.S.C. § 405(g). Ms. Harris moves to reverse, or, in the alternative, to remand, Administrative Law Judge Eskunder Boyd's ("ALJ Boyd") decision as not supported by substantial evidence. [Dkt. 13 (Pl. Mot. To Rev.)]. Defendant Andrew Saul (the "Commissioner") moves to affirm the Commissioner's final decision, as expressed by ALJ Boyd. [Dkt. 14 (Def. Mot. To Affirm)]. For the reasons stated below, the Court DENIES Ms. Harris's motion to reverse and remand and GRANTS the Commissioner's motion to affirm.

### I. Background

#### A. *Procedural Background*

---

[1] Andrew Saul is substituted as a party per Fed. R. Civ. P. 25(d).

In a determination dated March 1, 1998, Ms. Harris was found disabled beginning on December 1, 1991. [Dkt. 10 at 11][2]. A determination dated July 1, 2002 found that her disability had continued. *Ibid.* A determination dated March 18, 2016 found Ms. Harris no longer disabled as of May 31, 2016. *Ibid.* On May 18, 2016, Ms. Harris requested reconsideration. [R. 57]. On May 10, 2017, a State agency Disability Hearing Officer, Shannon Simmons, upheld the determination. [R. 60-65]. Within fourteen days, Ms. Harris filed a written request for a hearing before an administrative law judge (ALJ). [R. 74]. On April 24, 2018, Ms. Harris appeared by telephone and testified, without assistance, at a hearing in front of ALJ Boyd on April 24, 2018 in New Haven Connecticut. [R. 25-51]. Richard B. Hall, an impartial vocational expert, also testified at the hearing via telephone. *Id.* On July 10, 2018, ALJ Boyd issued a decision finding that Ms. Harris's disability ended on May 31, 2016, and that Ms. Harris has not become disabled again since that date. [R. 8-24]. Within thirty day, Ms. Harris filed a request for review. [R. 111]. On October 18, 2018, the Appeals Council denied Ms. Harris's request for review. [R. 1-5]. Ms. Harris timely petitioned the U.S. District Court for review of ALJ Boyd's decision. [Dkt. 1 (Compl.)].

   **B.** *Relevant Medical History*

   The Court bases this medical chronology on the submissions of Ms. Harris and the Commissioner. [Dkts. 13, 14].

---

[2] Citations to the record, [Dkt. 10], are identified as [R. __].

Ms. Harris's seizures started when she was eight and had urinary incontinence at school. [R. 216]. When she was ten, she experienced seizures with an aura of tight chest, dyspnea, speech arrest with blinking and twitching and arm elevation over her head for one or two minutes, followed by a head ache and confusion. [R. 216, 221]. Ms. Harris was initially awarded benefits as a child on January 22, 1992 when she met listing 11.02 for epilepsy. [R. 62]. Her beneifts were continued after a continuing disability review in July of 2002. [R. 62].

On February 12, 2015, Ms. Harris visited Dr. Duckrow, her neurologist. [R. 221]. Her last visit was had been in July of 2014. *Ibid.* Dr. Duckrow noted that, in October 2012, Ms. Harris began taking Clobazam, which brought her seizures down from two to three a week to one to two per month. Ms. Harris's seizures are brief, lasting less than thirty seconds, and can occur once to twice a day. [R. 221]. She can have an aura of fearful premonition or an anxious feeling in her upper chest or nose, as if she cannot catch her breath. *Ibid.* This feeling is sometime associated with a loss of posture – she slumps over and can falls. *Ibid.* Dr. Duckrow records that she probably poked her left eye with her fingernail extensions during such a seizure. *Ibid.* Ms. Harris can also lose contact and then blink for twenty seconds, with immediate return of awareness, picking up a conversation where it left off. *Ibid.* Ms. Harris's seizures cluster around her menses. *Ibid.* Perhaps three or four times a month, she will experience the fear aura. Increasing the medication dose does not reduce the frequency of her seizures, but has reduced their severity and duration. *Ibid.* Ms. Harris consistently rejects a surgical option. *Ibid.*. Dr. Duckrow instructed Ms. Harris to increase her dosage of Clobazam. *Ibid.*

With regards to Ms. Harris's migraine headaches, in February of 2015, Dr. Duckrow stated that Ms. Harris took 400 milligrams of Naproxen (Alleve) at the first sign and repeated after four hours. [R. 221]. Naproxen provided intermittent relief. [R. 222]. Dr. Duckrow instructed Ms. Harris to instead take four tablets of naproxen (a total of 800 milligrams) at the first sign of her migraine, but not to take more, and asked her to call if the approach did not work. *Ibid.* At the time, she was also noted to have constipation and low back pain. [R. 221].

Four months later, on June 18, 2015, Ms. Harris had a neurology visit with Dr. Duckrow. [R. 216]. Dr. Duckrow described her as having intractable epilepsy, with medically intractable complex partial seizures, as well as chronic migraine without aura. *Ibid.* He noted that Ms. Harris responded to a high dose of clobazam and reported only one seizure a month before her menses. *Id.* at 217. She reported that the seizure is short occurs at night and involves no loss of consciousness. She reported that her migraines continued two to three times per month but were responding to a combination of Sumatriptan and Naproxen, [R. 217], although Dr. Duckrow questioned whether a higher dose of Sumatriptan was needed. [R. 219]. Lately, her medication effects seemed to be wearing off. [R. 217]. Although Dr. Duckrow instructed Ms. Harris to return in four months, [R. 218], she did not return until nine months later, on March 31, 2016. [R. 250].

On February 22, 2016, state agency reviewer Dr. Maria Lorenzo indicated that there was not sufficient longitudinal medical evidence of record because there were only notes from February 2015 and June 2015 and asked for follow-up neurology notes, [R. 225] but the final page of her report states that "claimant has

been non-compliant with follow-up visits with neuro after 6/2015 as indicated by examiner. [Medical evidence of record] otherwise shows improved seizure frequency and severity." [R. 233, 234]. Dr. Lorenzo wrote that seizure control was improved, migraine headaches were controlled with Sumatriptan and Naproxen, and Plaintiff was able to do chores independently. [R. 231]. Dr. Lorenzo compared the evidence supporting Ms. Harris's most recent allowance (comparison point decision, or CPD) compared to the current evidence. Dr. Lorenzo wrote that, at the time of the CPD, Ms. Harris met Listing 11.02 based on ongoing frequent seizures, specifically perimenstrual clusters of five-to-six seizures occurring at any time of the day, and frequent complex partial seizures, described as arrest of activity, staring, and stiffening, with posturing of the bilateral upper extremities. [R. 234]. Dr. Lorenzo then wrote that the current file show improvement in seizure control, as neurology notes in February and June of 2015 show a decrease in seizure frequency to one a month, with the residual seizure described as mild and short. [R. 233].

Dr. Lorenzo found that Ms. Harris could perform the exertional requirements of medium work. She limited Ms. Harris to occasional lifting of 50 pounds, frequent lifting of 25 pounds, standing and/or walking of six hours in an eight-hour day, sitting six hours in an eight-hour day, unlimited pushing and pulling, and avoidance of all exposure to hazards (machinery, heights, etc.), due to seizure precautions, and no postural, manipulative, communicative, or visual limitations. [R. 227-30].

On March 15, 2016, state agency reviewer Dr. Pamela Fadakar, Psy. D., gave her opinion that Ms. Harris's anxiety related disorder is non-severe. [R. 235]. She opined that Ms. Harris is mildly limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. [R. 245].

On March 18, 2016, Ms. Harris's disability was discontinued as of May 31, 2016. [R. 52-56].

On March 31, 2016, Ms. Harris had a neurology visit with Dr. Duckrow. [R. 250-252]. Her last visit was June of 2015. [R. 250]. She was noted to have intractable complex partial seizures. *Ibid.* Her simple partial experiential fits continued to occur one to two times per month at any time of her menses. *Ibid.* Dr. Duckrow described these fits as anxious fear dyspnea spells lasting less than 20 seconds without loss of contact and were usually occurring around 10:00 PM. *Ibid* They are anticipated by a more continuous aura of a feeling in the chest that occurs during the menses. *Ibid.* Dr. Duckrow noted that Ms. Harris was content with that degree of control. *Ibid.* She had no spells of lost consciousness. *Ibid.*

During the March 2016 visit, the bigger problem was that her migraine headaches stopped responding to the combination of Sumatriptain and Naproxen. *Ibid.* Ms. Harris described a frontal or occipital lateralized headache on either side, but was more disturbed by the attending dizziness that makes her have to hold on to nearby objects for support. *Ibid.* She had nausea, photophobia, and phonophobia, but she was able to continue her activities and did not have to sleep. *Ibid.* Dr. Duckrow noted that these events occur 10 times per month and last from

three hours to all day. *Ibid.* They are provoked by lack of sleep or missed meals and are helped by drinking liquids. *Ibid.*

During a review of her symptoms at the March 2016 visit, Ms. Harris was positive for the following symptoms: tinnitus, blurred vision, double vision, photophobia, cough, chest pain and palpitations, constipation, back pain and falls, dizziness, tremors, speech change, seizures, headaches, environmental allergies, memory loss, nervousness and anxiousness with insomnia. [R. 252].

On August 12, 2016, state agency reviewer Dr. Kenneth Baines, Ph.D., gave his opinion that Ms. Harris's anxiety related disorders were not a severe impairment. [R. 255]. He opined that Ms. Harris has an anxiety disorder not otherwise specified due to seizure disorder, and that this is a medically-determinable impairment. [R. 260]. He opined that Ms. Harris has no restriction of activities of daily living, but has a mild restriction in maintaining social functioning and maintaining concentration, persistence, and pace. [R. 265].

On August 30, 2016, state agency reviewer Dr. Khurshid Khan assessed the same limitations as did Dr. Lorenzo. [R. 284-291].

Ms. Harris was scheduled for an appointment with Dr. Tara Kimbrough, MD on October 19, 2017. [R. 410].

On May 25, 2017, Ms. Harris had a neurology visit with Dr. Duckrow. Dr. Duckrow diagnosed her with epilepsy, epileptic syndrome with intractable complex partial seizures, intractable partial epilepsy with impairment of consciousness, and persistent intractable migraine aura. [R. 406]. She was also noted to have constipation and lower back pain. [R. 407].

7

On January 28, 2018, Ms. Harris wrote to ALJ Boyd that it is difficult for her to appear at her hearing because she is not as mobile as she would like to be, and, although she can walker, her seizures are unpredictable and she needs a companion to accompany her to the hearing. [R. 90-91]. She wrote that has "already fallen getting out of the LogistiCare car, and walking [to her] porch." [R. 90]. She elaborated that "there's no telling how I'll feel day to day." [R. 90].

Ms. Harris submitted additional information, a visit summary from Yale Medical Group dated April 18, 2018, to the Appeals Council. [R. 3]. Ms. Harris was prescribed the same medications as she had been at earlier visits, and in the same or lower doses. *Compare* [R. 416], *with* [R. 250].

### C. _Non-Medical Background and Evidence_

Ms. Harris was born July 27, 1979. [R. 269]. She graduated high school and has no past relevant work. [R. 17].

On February 11, 2016, Ms. Harris completed an activities questionnaire. [R. 137-145]. It indicates without elaboration that she has problems with talking, memory and concentration, [R. 143]. It also indicates that, when not interrupted by her infrequent seizure activity, she shops for groceries, washes dishes, and does laundry [R. 1401-141]; that she can follow written and spoken instructions, [R. 142]; that she gets along "fine" with authority figures, spends time in conversation with others, and has no problems getting along with family, friends, neighbors, or others [142-42]; and that she writes poems and short stories. [R. 140].

On February 11, 2016, Ms. Harris completed a seizure questionnaire, in which she reported that she had "maybe 3-4" seizures in an average month, which lasted

under a minute and occurred mostly at night, around the time of her menses. [R. 150].

Ms. Harris appeared by phone and testified at her hearing on April 24, 2018. [R. 25]. She appeared without representation. Ms. Harris did not look at her record before her hearing, and ALJ Boyd noted that the hearing office would burn her a CD-ROM and send it t her so she could look at the records. [R. 30]. Ms. Harris stated that she lives with her family. [R. 33]. She is not married and does not have children. [R. 33].

Ms. Harris testified that she is able to read, but sometimes she has problems speaking due to a stutter, and that gets "sluggish and things." [R. 34].

Ms. Harris said that she has never worked. [R. 35]. She has tried but it has not worked out because of her "diseases" that "do not discriminate." [R. 35]. She stated, "I could be walking in the middle of the street, and I'll have a seizure." [R. 35].

Ms. Harris said that she is able to dress herself and groom and bath herself, but sometimes she has to be careful of having a seizure or a blackout. [R. 35]. Ms. Harris has never had a driver's license because, to qualify for one, she must go a certain period of time without having a seizure, and she has never met the requirement. [R. 35-36]. Ms. Harris said that, through a typical day, she is mostly homebound. [R. 36]. If she goes out, she always goes with someone who knows about her seizures, and she does not go far. *Ibid.*

Ms. Harris stated that she started having seizures when she was around eight years old. [R. 37]. They started out as grand mal, but became a little smaller

and more frequent, so that she was having them every day, sometimes ten or more per day. *Ibid.* She did not have auras and she did not know when a seizure was coming. *Ibid.* She could be in school, or holding a tray of plates, and she would fall. *Ibid.*

Ms. Harris said that she now has three seizures per day, but she always has auras, which give her anxiety because she feels as though she is going to seizure. *Ibid.* Sometimes after an aura, she has a seizure, and sometimes she does not. *Ibid.* She has fallen and given herself bruises. [R. 38]. She has sustained black eyes, bruises, and hurt her legs to the point of limping for a month or so. [R. 39]. She becomes aware of herself a few minutes after a seizure. [R. 38]. Ms. Harris said that she also suffers from migraines, and is always dizzy with a lack of balance. [R. 42]. She has 10 migraines per month. *Ibid.* She did an EEG and was told that she may need to have surgery, but her doctors are not sure yet because she has a scar on her brain. *Ibid.*

Ms. Harris is complaint with her medication, and sees her neurologist regularly, including less than two weeks before the hearing. [R. 40-41].

Ms. Harris said that her seizures are triggered by lights, including lights from a TV or anything with a white background. [R. 43]. Even when she goes to the dentist, and they put the light in her face, that bothers her. [R. 43]. Also, comparatively bright light bothers her, and if she is sitting in the dark, and someone turns up the brightness, that sets off a seizure. [R. 43].

### D. ALJ Decision

ALJ Boyd first determined that the most recent favorable medical decision finding that Ms. Harris continued to be disabled is the July 1, 2002 determination, and designated this determination the "comparison point decision" (CPD). [R. 13]. ALJ Boyd then observed that at the time of the CPD, Ms. Harris had a seizure disorder that met the criteria for Listing 11.03. [R. 13]. Next, the ALJ found that after the CPD and through May 31, 2016, Ms. Harris continued to have a seizure disorder, and developed the additional medically determinable impairment of migraine headaches. *Ibid.*

At step one, ALJ found that, since May 31, 2016, Ms. Harris did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment in the Listings. *Ibid.* Next, at step two, ALJ Boyd found that medical improvement occurred by May 31, 2016, given the decrease in the frequency of her seizures by that time. *Ibid.* At step three, ALJ Boyd found that medical improvement was related to the ability to work in that, by May 31, 2016, Ms. Harris longer had an impairment or combination of impairments that met or equaled the Listing met at the time of the CPD. [R. 14]. Going to step five, ALJ Boyd found that Ms. Harris continued to have a severe impairment. [R. 14]. Then, after careful consideration of the entire record, ALJ Boyd found, that, beginning on May 31, 2016, Ms. DiRubba had the RFC to perform:

> A full range of work at all exertional levels, but with the following non-exertional limitations: the claimant should never climb ladders, ropes, scaffolds. She should avoid work with exposure to hazards (heights, moving machinery). She should also avoid work in exposure to bright lights to the face.

[R. 15].[3] At step six, ALJ Boyd found that Ms. Harris has no past relevant work, and so he proceeded to the final steps of the sequential evaluation process. [R. 17]. There, he relied on Medical-Vocation Rule 204.00 (20 C.F.R. Part 404, Subpart P, Appendix 2), with the vocational expert testimony, to find that, since May 31, 2016, Ms. Harris could perform other work existing in significant numbers in the national economy, namely the jobs of packer, cleaner, and retail marker. [R. 18]. Therefore, ALJ Boyd found that Ms. Harris's disability ended on May 31, 2016 and that she had not become disabled again since that date. [R. 18].

## II.   Standard of Review

In reviewing the denial of SSI benefits by the Social Security Administration ("SSA"), the district court "must determine whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater,* 104 F.3d 1432, 1433 (2d Cir.1997)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)); *see Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (same).

---

[3] ALJ Boyd found that Ms. Harris retained the RFC to preform work at all exertional levels, [R. 15], but observed that this difference from the state agency reviewers' findings was not material to the outcome of Ms. Harris's case, since all jobs identified by the vocational expert required only medium or light exertion. [R. 17-18]. Ms. Harris does not specifically contest this aspect of ALJ Boyd's finding regarding her exertional abilities.

"The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Norman v. Astrue*, 912 F. Supp. 2d 33, 70 (S.D.N.Y. 2012) (citing *Tejada v. Apfel*, 167 F. 3d 770, 773-74 (2d Cir. 1999)). To do otherwise "creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987), *quoted by Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998).

III.    Analysis

The Court first addresses whether ALJ Boyd fulfilled his duty to develop the record and then addresses whether there is substantial evidence to support ALJ Boyd's opinion.

A.    *Duty to Develop the Record*

Because of the "essentially non-adversarial nature of a benefits proceeding," *Pratts v. Chater*, 94 F. 3d 34, 37 (2d Cir. 1996), the ALJ has an "affirmative duty" to develop the administrative record. *Rosa v. Callahan*, 168 F.3d. 72, 78 (1999). "The ALJ must adequately protect a pro se claimant's rights by ensuring that all of the relevant facts are sufficiently developed and considered and by scrupulously and conscientiously probing into, inquiring of, and exploring for all the relevant facts." *Guillen v. Berryhill*, 697 F. App'x 107, 108 (2d Cir. 2017) (quoting *Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009)).[4] However, "where there

---

[4] The Commissioner argues that this case no longer applies, as its was decided based upon 20 C.F.R. § 416.913, which is no longer in effect. [R. 14 at 17-18]. But *Guillen* does not specify the regulations on which it relies, and at least one other

are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Id.* (quoting *Rosa*, 168 F.3d at 79 n.5). Ms. Harris alleges that ALJ Boyd failed to develop the record in four different ways. The Court addresses each in turn.

### 1. *Treating Source Statements*

First, Ms. Harris argues that ALJ Boyd failed to obtain any treating source statements that made the connection between Ms. Harris's exertional impairments and her residual functional capabilities. [Dkt. 13 at 10].

The SSA "make[s] every reasonable effort to help [the claimant] in getting medical reports when [the claimant] *gives [the SSA] permission to request them* from [the claimant's] physician, psychologist, or other medical sources." 20 C.F.R. § 416.993 ("Medical Evidence in Continuing Disability Cases") (emphasis added). When an ALJ holds open the record, and a claimant fails to provide additional evidence, the ALJ will be found to have fulfilled her duty to develop the record. *Brown v. Colvin*, No. 3:14-CV-1784(WIG), 2016 WL 2944151, at *3 (D. Conn. May 20, 2016) (collecting cases).

At the hearing, ALJ Boyd instructed Ms. Harris to complete the authorization form that allows the Social Security Administration to obtain her medical sources. [R. 47-48]; [R. 203-04] (blank "Authorization to Disclose Information to the Social

---

candidate regulation, 20 C.F.R. § 416.927, which supports *Guillen* would apply to the claim in this case. 597 F. App'x 107. Therefore, the Court treats *Guillen* as valid precedent.

Security Administration" form, sent June 13, 2017)]. ALJ Boyd advised Ms. Harris that he would mail her the form, and that she should sign it and sent it back. [R. 48]. He stressed the importance of the form, in that he could not get her records without it, and that this could adversely affect his ability to make a favorable decision in her case. [R. 48]. Ms. Harris said she understood. [R. 48-49]. ALJ Boyd also explained that Ms. Harris could submit her own records to her local social security field office. [R. 49]. Ms. Harris acknowledged that she understood this as well. [R. 50]. Before concluding the hearing, ALJ Boyd repeated the instruction that Ms. Harris should both bring her own records to the field office and sign and send back the authorization form. [R. 50].

In his opinion, dated July 13, 2018, ALJ Boyd stated that he left the record open, but Ms. Harris did not provide the form or submit any additional medical records, so ALJ Boyd made the determination on the available evidence. [R. 16]. Several state and federal laws protects Ms. Harris's privacy interests in her medical information. *See, e.g.,* Health Insurance Portability and Accountability Act, Publ. L. 104-191, 110 Stat. 1936 (1996). Therefore, since ALJ Boyd could not have contacted Ms. Harris's treating sources, he did not fail in his duty to develop the record by not doing so.

### 2. Completeness of Record Evidence

Second, Ms. Harris argues that ALJ Boyd failed to ameliorate the "obvious gap in the medical evidence." In support, she points to state agency reviewer Dr. Lorenzo's note that there was not sufficient longitudinal medical evidence on record as of February 22, 2016, because neurology office notes were limited to

February 2015 and June 2015. [R. 225]. Ms. Harris also points out that she informed ALJ Boyd that she has had recent EEG testing missing from the record, [R. 42], and that her April 18, 2018 neurology notes indicates that she had been scheduled for a brain MRI, PET Scan, and follow-up neurology appointment in summer and fall of 2018. [R. 415].

When a claimant first applies for benefits, a complete medical history consists of a person's records for the twelve months leading up to the month in which the claimant files her application. *See* 20 C.FR. § 416.912(b) (ordinary record development responsibility spans one year prior to the start of the relevant period).

Here, ALJ Boyd had Ms. Harris's complete medical history for the year her March 2016 continuing disability review date: he had her treatment records for February 2015, June 2015, and March 2016. *See* [R. 217] (before her June 2015 appointment, Ms. Harris was last seen in February 2015); R. 250 (before her March 2016 appointment, Ms. Harris was last seen June 2015). While it is true that Dr. Lorenzo noted that there was not sufficient longitudinal medical evidence on record, [R. 225], she also noted, likely later, that the absence of treatment notes occurred because Ms. Harris had not appeared at follow-up appointments, so no further treatment notes were available for the year. [R. 234]. She ultimately gave an RFC assessment based on the existing treatment notes, [R. 234], as did Dr. Kahn. [R. 290-91]. Therefore, the Court finds that there was no gap in the medical evidence for 2015 to 2016.

Next, the Court considers whether the missing pre-April 2018 EEG testing and notes from the later half of 2018 constitute a gap in the record. Ms. Harris's

patient notes for her April 18, 2018 neurology visit indicate that there were no changes in the medication she was prescribed since her previous visit. [R. 415-16]. Because, as described above, the SSA requested but did not receive permission to contact Ms. Harris's doctors to rectify any gap, the only way in which the SSA could have failed to develop the record is by failing to provide Ms. Harris with a consultative exam. The Regulations provide: "If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled ..., we may ask you to have one or more physical or mental examinations or tests." 20 C.F.R. § 416.917. "The decision to purchase a consultative examination will be made on an individual case basis in accordance with the" Regulations. 20 C.F.R. § 416.919. A consultative examination may be provided by the SSA "to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim." 20 C.F.R. § 416.919a. Because the SSA does not require electroencephalography (EEG) test results, the SSA will not provide them. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 11.00.H.5.

"It can be reversible error for an ALJ not to order a consultative examination when an examination is required for an informed decision. However, an ALJ is not required to order a consultative examination if the facts do not warrant or suggest the need for it." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 32 (2d Cir. 2013) (internal citation omitted). Persuasive precedent from this district establishes that a consultative examination is not necessary where an ALJ has two years of the claimant's medical records and a state-reviewing non-examining physician; the

claimant points to no conflict, inconsistency, or ambiguity in the evidence that requires resolution; and two state-reviewing non-examining physicians determined that a consultative examination was not required. *Velazquez v. Berryhill*, No. 3:18CV01385(SALM), 2019 WL 1915627, at *7 (D. Conn. Apr. 30, 2019).

Here, as in *Velazquez,* the ALJ had plaintiff's medical records for two years, from 2015 through 2017, as well as findings from stat reviewing non-examining physicians. *Id.* As in *Velazquez*, after reviewing the medical evidence, neither of the state reviewing non-examining physicians determined that a consultative examination was necessary. *Id.* As in *Velazquez*, there is no conflict or inconsistency in the medical evidence that "required resolution." *Id.* As noted, the SSA does not provide EEG tests. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 11.00.H.5. Therefore, the Court finds that ALJ Boyd did not err in not obtaining medical expert testimony or a consultative examination.

### 3. *Necessity of Medical Expert*

Ms. Harris next argues that ALJ Boyd should have obtained medical expert testimony to "get clarification from a medical expert as to Ms. Harris's seizure activity and the applicability of the Listings." [R. 12-13].

"Administrative law judges may… ask for medical evidence from expert medical sources." 20 C.F.R. 416.913a(b)(2). An ALJ may not decide whether a claimant's impairment meets a listing requirement without "consideration of a medical judgment about medical equivalence furnished by one or more physicians designated by the Secretary. The Disability Determination Services physician's documented medical judgment as to equivalency meets this regulatory

requirement." *Titles II & Xvi: The Sequential Evaluation Process*, SSR 86-8 (S.S.A. 1986)

Here, ALJ Boyd had Ms. Harris's medical records for two years, from 2015 through 2017, as well as findings from state reviewing non-examining physicians. After reviewing the medical evidence, neither of the state reviewing non-examining physicians found that Ms. Harris met or equaled a listing, as both noted that her seizure frequency had decreased, and both went on to do an RFC assessment. [R. 234, 290]. While ALJ Boyd does not explicitly note that he considered the state reviewing physicans' judgments at the listing stage, any error is harmless as his decision agrees with theirs, he gives their judgments "great weight" at the RFC stage, [R. 17], and their judgments meet the requirement of SSR 86-8. Ms. Harris argues that there is ambiguity in the relationship between seizures and migraines. [Dkt. 13 at 13] (citing Paul T.G. Davies and C.P. Panayiotopoulos, *Migraine triggered seizures and epilepsy triggered headache and migraine attacks: a need for re-assessment*, J. Headache and Pain 12 (3): 287-288 (2011)). But Ms. Harris's neurologist did not identify any such ambiguity. [R.250 (Mar. 31, 2016 Treatment Notes by Dr. Duckworth, identifying migraines as "provoked by lack of sleep or missed meals")]. Further, the reviewing non-examining state physicians considered and ruled out the at least one other source of Ms. Harris's migraines. [R. 288].Therefore, the Court finds that ALJ Boyd did not err in not obtaining medical expert testimony.

### 4. Questioning of Vocational Expert

Finally, Ms. Harris argues that ALJ Boyd failed to inform Ms. Harris of her right to cross examine the vocational expert. [Dkt. 13 at 13-13]. Ms. Harris also argues that ALJ Boyd failed to question the vocational expert regarding the effects of off-task behavior, of a limitation to no bright lights overhead, and of the effects of lower absenteeism, of one or two absences per month. *Id.*

Claimants have a right to cross-examine vocational experts, *Alvarez v. Bowen*, 704 F. Supp. 49, 53 (S.D.N.Y. 1989), though failure to inform a claimant of such a right is harmless error if an ALJ "vigorously explor[es] for all of the relevant facts" himself or herself. *Id.* at 54. "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion and [the hypothetical] accurately reflect[s] the limitations and capabilities of the claimant involved." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (internal quotation marks and citations omitted). A "vocational expert is not required to identify with specificity the figures or sources supporting his conclusion, at least where he identified the sources generally." *Id.* at 152 (finding substantial evidence where vocational expert relied on "professional experience and clinical judgment," and no more specific basis for his opinion was necessary). But, "evidence cannot be substantial if it is 'conjured out of whole cloth.'" *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 450 (2d Cir. 2012) (quoting *Donahue v. Barnart*, 279 F.3d 441, 446 (7th Cir. 2002) with qualified approval).

Here, ALJ Boyd asked the vocational expert about the availability of jobs based on exertional limitations, and additional limitations of never climbing

ladders, ropes, or scaffolds, no exposure to hazards, heights, or moving machinery, and no bright lights in the face. [R. 44-45]. ALJ Boyd then asked about absenteeism of three or four times a month. [R. 45]. He then asked about whether the vocational expert's testimony was consistent with the *Dictionary of Occupational Titles*. [R. 46]. He also asked Ms. Harris if "there were any other work-related limitations that [ALJ Boyd] did not express to the VE that [Ms. Harris] want[[ed] to talk to him about," and Ms. Harris answered, "no." [R. 47].

The Court finds that ALJ Boyd informed Ms. Harris of the core of her right to cross-examine the vocational expert, namely, to ask him additional questions about limitations. Further, unlike the ALJ in *Alvarez*, ALJ Boyd asked the vocational expert detailed hypotheticals that reflected ALJ Boyd's ultimate RFC determination, as well about the source from which he drew his testimony. [R. 44-47]. While ALJ Boyd did not ask the vocational expert about where he drew his opinions about bright light exposure or absenteeism, the vocational expert himself supplied that he used his professional experience. [R. 45-46]. Because ALJ Boyd's hypothetical reflected his ultimate RFC determination, there is no error.

### B. *Substantial Evidence*

Ms. Harris next argues that the ALJ's decision was not supported by substantial evidence at any step of his evaluation. [Dkt. 13 at 14-18]. The Court will consider each in turn.

In general, "an individual shall be considered to be disabled… if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3).

The SSA evaluates whether an SSI claimant's previous disability has ended through an eight-step sequential process. 20 C.F.R. § 416.994(b)[5]:

1. Does the claimant have "an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of subpart P of part 404 of the regulation?" 20 C.F.R. § 416.994(b)(5)(i). If so, the claimant's disability will be found to continue. *Id.* If not, the SSA goes on to Step 2.

2. Has the claimant experienced "a medical improvement?" [b-1-i]. 20 C.F.R. § 416.994(b)(5)(ii). If there has been medical improvement, the SSA goes on to Step 3. *Id.* If not, the SSA goes on to Step 4.

3. Is the claimant's medical improvement related to the claimant's "ability to do work?" 20 C.F.R. § 416.994(b)(5)(iii). If so, the SSA goes on to Step 5. *Ibid.* If note, the SSA goes on to Step 4. *Ibid.*

4. Do any of the exceptions in (b)(3) and (b)(4) apply? 20 C.F.R. § 416.994(b)(5)(iv). If not, the claimant's disability will be found to continue. *Ibid.* If an exception in the first group applies, the SSA goes on to Step 5. *Ibid.* If an exception from the second group applies, the claimant's disability will be found to have ended. *Ibid.*

5. Are all of the claimant's "current impairments in combination severe"? 20 C.F.R. § 416.994(b)(5)(v). If so, the SSA goes on to Step 6. *Ibid.* If not, the claimant's disability will be found to have ended. *Ibid.*

6. Does the claimant have residual functional capacity, such that the claimant can still do work that they have done in the past? 20 C.F.R. § 416.994(b)(5)(vi). If so, the claimant's disability will be found to have ended. *Ibid.* If not, the SSA goes on to Step 7. *Ibid.*

7. Given the claimant's RFC, can the claimant adjust to "other work given [the RFC] and [the claimant's] age, education, and past work experience" ? 20 C.F.R. § 416.994(b)(5)(vii), (viii). If so, the

---

[5] Ms. Harris cites 20 C.F.R. § 404.1594(f) for the evaluation process, [Dkt. 13 at 16], but her claim is under Title XVI of the Social Security Act, so 20 C.F.R. § 416.994 applies instead. *E.g.* R. 52.

claimant's disability will be found to have ended. *Ibid.* If not, the claimant's disability will be found to continue. *Ibid.*

ALJ Boyd first determined that the most recent favorable medical decision finding that Ms. Harris continued to be disabled is the July 1, 2002 determination, and designated this determination the "comparison point decision" (CPD). [R. 13]. ALJ Boyd then observed that at the time of the CPD, Ms. Harris had a seizure disorder that met the criteria for Listing 11.03. [R. 13]. Next, the ALJ found that after the CPD and through May 31, 2016, Ms. Harris continued to have a seizure disorder, and developed the additionally medically determinable impairment of migraine headaches. *Ibid.*

1. *Listing Equivalence*

"For a claimant to show that [her] impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* Ms. Harris agrees that she no longer experiences tonic-clonic (*i.e.*, grand mal) seizures. To qualify for the listing, her condition must be characterized by one of the following:

B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or

D. Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

1. Physical functioning (see 11.00G3a); or

2. Understanding, remembering, or applying information (see 11.00G3b(i)); or

3. Interacting with others (see 11.00G3b(ii)); or

4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or

5. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 11.02.

At step one, ALJ Boyd found that, since May 31, 2016, Ms. Harris did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment in the Listings. [R. 14]. As discussed above, the state agency medical reviewers agreed that Ms. Harris did not meet any listing. [R. 2xx, 283]. ALJ Boyd cited to Ms. Harris's June 2015 treatment notes, which stated that Ms. Harris experienced only one seizure a month. [R. 14 (citing R. 250)]. In his March 2016 treatment notes, Ms. Harris's neurologists stated that her seizures "continue to occur 1-2/mo during the menses" (though, as these seizures "can occur 1-2/d," it is likely that the SSA would count them as more infrequent than Ms. Harris's neurologist would. [6]). [R. 283]. In either case, any error is harmless since ALJ Boyd correctly found that there was no evidence of seizures occurring at least every two weeks, let alone once a week. [R. 250, 283].

---

[6] The Court notes that one cause of confusion may be the differing definitions of "one seizure" by the SSA and Ms. Harris's neurologists. The SSA counts "multiple seizures occurring in a 24-hour period as one seizure." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 11.00.H.4.a. Ms. Harris's neurologists counted multiple seizures occurring in a day as multiple seizures. *See* [R. 250 ("seizures… can occur 1-2/d")].

Further Ms. Harris does not demonstrate a marked limitation in any of the relevant functional areas. While Ms. Harris stated that she has fallen during past seizures, *e.g.* [R. 90], she has not connected the precautions she must take to any marked limitation. Ms. Harris's February 11, 2016 activity report indicates without elaboration that she has problems with talking, memory and concentration, [R. 143]. It also indicates that, when not interrupted by her infrequent seizure activity, that she shops for groceries, washes dishes, and does laundry [R. 1401-141]; that she can follow written and spoken instructions, [R. 142]; that she gets along "fine" with authority figures, spends time in conversation with others, and has no problems getting along with family, friends, neighbors, or others [142-42]; and that she writes poems and short stories. [R. 140]. Therefore, the Court finds that this finding was supported by substantial evidence.

### 2. *Medical Improvement*

A medical improvement is "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." *Id.* § 416.994(b)(1)(i). It must be based on "changes (improvement) in the symptoms, signs, or laboratory findings." *Ibid.*

At step two, ALJ Boyd found that medical improvement occurred by May 31, 2016, given the decrease in the frequency of her seizures from two to three fits per week to one to two per month. [R. 14 (citing R. 234-35)]. ALJ Boyd further noted that Ms. Harris was "content with this degree of control." [R. 14 (citing R. 250)]. While Ms. Harris asserts that "there has been no medical improvement," [Dkt. 13 at

17], she does not provide any argument beyond that conclusory statement. Therefore, the Court finds that this finding was supported by substantial evidence.

### 3. *Medical Improvement Related to the Ability to Do Work*

If the SSA's most recent favorable decision "was based on the fact that [the claimant's] impairment(s) at the time met or equaled the severity contemplated by the Listing of Impairments…, and the severity of the prior impairment(s) no longer meets or equals the same listing section used to make [the] most recent favorable decision, [the SSA] will find that the medical improvement was related to [the claimant's] ability to work." 20 C.F.R. § 416.994(b)(2)(iv)(A).

At step three, ALJ Boyd found that medical improvement was related to the ability to work in that, by May 31, 2016, Ms. Harris longer had an impairment or combination of impairments that met or equaled the Listing met at the time of the CPD. [R. 14]. While Ms. Harris asserts that "there has been no medical improvement related to the ability to do work," [Dkt. 13 at 17], she does not give any support for her conclusory assumption. Therefore, the Court finds that this finding was supported by substantial evidence.

### 5. *Severity of Impairment*

Going to step five, ALJ Boyd found that Ms. Harris continued to have a severe impairment. [R. 14]. Ms. Harris does not challenge this finding, and the Court finds that it is supported by substantial evidence.

### 6. *Residual Functional Capacity & Ability To Work*

Ms. Harris challenges ALJ Boyd's RFC on two grounds: that ALJ Boyd failed to incorporate off-task behavior and absenteeism as a limitation, and that ALJ Boyd

did not include non-exposure to bright lights or fluorescent lights as a limitation. [Dkt. 13 at 14-16]. The Court agrees with the Commissioner's argument that Ms. Harris's claim is essentially that ALJ Boyd should have adopted Ms. Harris's hearing testimony.

"In most cases, (see paragraph (b)(4) of this section for exceptions) [the SSA] must also show that [the claimant is] currently able to engage in substantial gainful activity before [the SSA] can find that [the claimant is] no longer disabled." 20 C.F.R. § 416.994(b). To do this, the SSA will assess the claimant's residual functional capacity and consider whether the claimant can still do work she has done in the past, or whether she adjust to do "other work given the [RFC and her] age, education, and past work experience." 20 C.F.R. §994(b)(5)(vi), (vii), (viii).

"[T]he opinions even of non-examining sources may override treating sources' opinions and be given significant weight, so long as they are supported by sufficient medical evidence in the record." *Correale-Englehart v. Astrue*, 687 F. Supp.2d 396, 427 (S.D.N.Y. 2010); *see Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) [more?]. "State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 416.913a(b)(1). Accordingly, administrative law judges must consider prior administrative medical findings, *id.* and 20 C.F.R. § 927(e), according to §§ 416.920b and 416.927(c).

On the other hand, "medical source opinions that are conclusory, stale, and based on an incomplete medical record may not be substantial evidence to support an ALJ finding." *Camille v. Colvin*, 104 F. Supp. 3d 329, 343 (W.D.N.Y. 2015) (citation

and internal quotation marks omitted), *aff'd*, 652 F. App'x 25 (2d. Cir. 2016); *see Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996) (holding that record was "inadequate to support a denial of benefits" where only expert medical testimony was by a non-examining expert, much of claimant's medical history, including his "initial diagnosis…, lab results…, medications…, and treatment notes," was absent from the record, and the records that did appear were "incomplete or illegible").

When determining "the extent to which [a claimant's] symptoms… affect [her] capacity to perform basic work activities, [the SSA] consider[s] all of the available evidence…. including [the claimant's] statements about the intensity, persistence, and limiting effects of [her] symptoms." 20 C.F.R. § 416.929(c)(4); *see* SSR 16-3p, 2017 WL 5180304, at *7-8 (S.S.A. Oct. 25, 2017). The SSA will "evaluate" these statements "in relation to the objective medical evidence and other evidence," and in doing so will consider whether there are any "inconsistencies" or "conflicts." 20 C.F.R. § 416.929(c)(4). In determining a claimant's RFC, an ALJ "is not required to accept the claimant's subjective complaints without question." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

At her hearing, Ms. Harris answered "yes," when asked if "absenteeism is the big issue for [her]. [R. 47]. She further stated that "bright lights" in her face bother her, and that even if she was sitting in dimmed light, and brighter light were turned on, it would bother her. [R. 43]. She stated that light from a television screen with a white background would bother her. *Id.* When ALJ Boyd asked if such light would "set off a seizure," Ms. Harris answered, "yes." *Id.* In her February activities report, Ms. Harris stated that one of her hobbies is "watching TV," and that she

does so "kinda often." [R. 140]. After presenting a hypothetical involving exposure to bright light to the vocational expert, ALJ Boyd asked Ms. DiRubba whether she had "any other work-related limitations" that she wanted to talk to the vocational expert about, and she declined to do so. [R. 47].

"After careful consideration of the entire record," ALJ Boyd formulated an RFC that did not include a limitation for absenteeism. [R. 15]. While the RFC stated that Ms. Harris should avoid "bright lights to the face," it did not include a limitation against "brighter light… (not pointed directly in her face)." [Dkt. 15]. In formulating his RFC, ALJ Boyd gave great weight to the administrative findings of Dr. Lorenzo and Dr. Khan. [R. 17].

The Court finds that ALJ Boyd's RFC is supported by substantial evidence. More specifically, after evaluating Ms. Harris's testimony's consistency with the rest of the available evidence, ALJ Boyd did not err in considering Ms. Harris's statements "only to the extent that they can reasonably be accepted as consistent with the objective medical and other evidence." [R. 16]. ALJ Boyd specifically found that Ms. Harris's statement that she has "ongoing seizures" "contrasts with the available medical evidence showing far fewer seizures," an analysis that supports his decision that Ms. Harris did not need an additional limitation for ambient light nor for absenteeism. *Ibid.* Further, ALJ Boyd did not err in giving great weight to the administrative findings of Dr. Lorenzo and Dr. Khan, which were well-supported, included a clear articulation of their basis, and were consistent with the record as a whole. *See* 20 C.F.R. § 927(c)(3), (4).

ALJ Boyd found that Ms. Harris has no past relevant work, and so he proceeded to the final steps of the sequential evaluation process. [R. 17]. There, he relied on the factors Medical-Vocation Rule 204.00 (20 C.F.R. Part 404, Subpart P, Appendix 2), along with the vocational expert testimony, to find that, since May 31, 2016, Ms. Harris could perform other work existing in significant numbers in the national economy, namely the jobs of packer, cleaner, and retail marker. [R. 18]. Therefore, ALJ Boyd found that Ms. Harris's disability ended on May 31, 2016 and that she had not become disabled again since that date. [R. 18]. Ms. Harris does not challenge ALJ Boyd's determination of these steps beyond her challenge to his RFC.

Therefore, the Court finds that Commissioner did provide substantial evidence showing that Ms. Harris is able to engage in substantial gainful activity.

IV.     Conclusion

For the reasons set out above, the Court affirms ALJ Boyd's decision. Accordingly, the Court DENIES Ms. Harris's motion to reverse and remand and GRANTS the Commissioner's motion to affirm. The Clerk is directed enter judgment in favor of the Commissioner and close the case.

IT IS SO ORDERED.
_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated this day in Hartford, Connecticut: March 30, 2020